**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **MARTHA HOLMES,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 3:11-cv-0594** |
| | ) | |
| **ALIVE HOSPICE, INC.** | ) | **JUDGE SHARP** |
| | ) | **MAGISTRATE JUDGE GRIFFIN** |
| **Defendant.** | ) | |
| | ) | **JURY DEMAND** |

_____

**PLAINTIFF'S RESPONSE TO DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT**
_____

**I.     Facts**

Plaintiff Martha Kay Holmes ("Holmes") was hired as a continuous care Licensed Practical Nurse ("LPN") at Defendant Alive Hospice, Inc. ("Alive Hospice") in April, 2008. She was assigned to the "flex team", after-hours on-call nurses ("PRN") who provided continuous care for patients at the facility and at homes, staffed the call center, and filled in for regular nurses as needed. *(see* d.e. 40-1, Holmes Dep. pp. 23-25, 36). In April 2009, Holmes applied for a full-time call center position at Alive Hospice and was hired for the call center position by Kathy Owens, RN, ("Owens"), who, at the time, was the Director of the Flex Team and the Call Center, and Holmes' supervisor. (*see* d.e. 42-1, Owens Dep. pp. 6-8; d.e. 40-3, Holmes Dep. 104, 105).

During the 2009 interview process, on the job interview evaluation form, Owens noted that Holmes was an asset to continuous care and also very understanding of clients' needs. Owens further noted that she believed Holmes would be a great addition to the team in the call center. (Owens Dep. p. 56; *see* d.e. 41-3, Owens Dep. Ex. 5) Owens supervised Holmes'

1

throughout Holmes' assignment to the flex team and in the call center. (*see* d.e. 42-1, Owens Dep. 11, 14). Holmes first worked the night shift in the call center, 4:00 p.m. to midnight, and later transferred to the day shift, 7:30 to 4:00 p.m., a newly created position. (*see* 40-3, Holmes Dep. pp. 96, 97; d.e. 42-1, Owens Dep. p. 12).

Alive Hospice did not have a day shift in the call center at this time. In November 2009, Holmes was part of a pilot program in the call center, which created a daytime call center position. She was a full-time resource nurse in the pilot program, and was later hired into that position. On that job interview evaluation form, Owens noted that Holmes did an excellent job during the pilot program, and was very helpful to patients and physicians alike. (*see* d.e. 42-3; Owens Dep. pp. 58,59; Owens Ex. 6). In fact, Owens emailed Human Resources representative Jason Guy ("Guy") and reiterated what a great job Holmes had done in the day call center, and asked if Holmes could receive a raise. (November 8, 2009 email from Owens to Guy, Bates no. D000300).

In early 2009, Owens became ill and was at home on intermittent Family Medical Leave Act ("FMLA") leave. (*see* d.e. 42-2, Owens Dep. p. 36, 38; d.e. 40-2, Holmes Dep. p 42). During Owens' absence, and unbeknownst to Owens, Holmes shouldered some of her duties in an effort to assist Owens and ensure she did not lose her job due to her absence. Holmes took on the extra work because she cared about her co-worker, but Owens' absence began negatively affect Holmes. Owens would call into the call center numerous times a day, preventing Holmes from taking patient and doctor calls and preventing her from effectively performing her job. (*see* d.e. 40-2, Holmes Dep. pp. 42, 43). Holmes took her concerns to Owens' supervisor, Anne Chance, and asked for advice regarding the situation.

Holmes did not make negative comments about her supervisor, Owens, in the workplace or to her co-workers, and she did not tell Owens' that her staff hated her. (*see* d.e. 40-2, Holmes Dep. pp. 40-41, 43). At one point during Owens' absence, as employees are prone to do, Holmes' expressed some frustration to a co-worker (Cynthia Mayberry ("Mayberry"). She told Mayberry she was not being compensated for the extra work she had taken on, and much of it was done outside of working hours. (*see* d.e. 41-4, Mayberry Dep. p. 21). Holmes did a lot more work than other call center employees. (*see* d.e. 41-4, Dep. Mayberry p. 24).

At Alive Hospice, if an employee requested to use accrued vacation time ("Paid Time Off or "PTO"") for an absence exceeding three days then there was no reason for Human Resources to send Family Medical Leave Act ("FMLA") paperwork for completion by the employee (*see* d.e. 42-5, Deposition of Edith Scott ("Scott") Dep. pp. 19, 20). PTO may be used for vacation, time off for personal reasons, appointments and first three days of illness unless pre-approved. (Alive Hospice Employee Handbook, ("Handbook") pg. 14). PTO is also used when a short-term illness keeps an employee away from work, and employees having missed work may be required to show proof of illness by having a doctor's release stating he or she was sick and is released for return to his or her normal duties. (Handbook, pg. 19)

In December 2009, Holmes' primary care physician, Donald O. Ezuteh M.D., suggested that she take time off of work due to personal issues causing stress in her life. (*see* d.e. 40-3, Holmes Dep. pp. 107,108; d.e. 41-3, Holmes Ex. 20). Holmes promptly called Owens for approval to use PTO time which she had accrued, which Owens granted. (*see* d.e. 40-3, Holmes Dep. pp. 107, 108; d.e. 42-2, Owens Dep. pp. 50, 51). Owens sent an email on December 3, 2009 to Scott stating that Holmes would be out of the office from December 3 to December 14, 2009.

Scott sent an email to Owens on December 14, 2009 informing Owens that she should enter Holmes' time into Easy Labor, Alive Hospice's timekeeping system, as follows:

- Pay for days hours work 11/30 thru 12/12/09
- 24 PTO hours 12/03, 12,04, 12,07
- 32 ESB hours 12/08 thru 12/12

(*see* d.e. 42-2, Owens Dep. 50-52; Owens Ex. 2, 3)

"ESB" is an accrued Extended Sick Bank. Full time (40 hour) employees accrue an extended sick bank at six (6) hours per month to a maximum of 480 hours. The extended sick bank is charged to the employee after twenty-four (24) consecutive hours of missed work for illness or injury. The first twenty-four (24) hours will be charged to the employee's PTO bank. Employees may borrow up to forty (40) hours Extended Sick Bank while on an approved medical leave for their own illness. PTO may be used for vacation, time off for personal reasons, appointments and first three days of illness unless pre-approved for illness or injury. (Handbook pp. 14,18,19).

Holmes believed that her accrued PTO would cover her absence in December; at no time did she believe it to fall under FMLA. (*see* d.e. 40-3, Holmes Dep. pp. 110-112). Unbeknownst to Holmes, on or around December 3, 2009, Dr. Ezuteh transmitted to Alive Hospice a note indicating that she would be out of work until December 14, and could return to work without restrictions on December 14. He did not list the reason for her absence. (*see* d.e. 40-3, Holmes Dep. pp. 108, 110-111; d.e. 41-3, Holmes Ex. 20).

If an employee notified a member of Human Resources at Alive Hospice that they needed to take FMLA, or if the employee's direct supervisor notified a member of Human Resources at Alive Hospice that the employee had been out of work for more than seventy-two (72) hours for an FMLA-qualifying event, Human Resources would send to the employee FMLA paperwork for completion. (*see* d.e. 42-4, Dep. Scott, p. 14); d.e. 42-6, Affidavit of Guy at ¶ 7). Alive

4

Hospice's policy regarding FMLA provided for twelve (12) weeks of unpaid leave in a twelve (12) month rolling time period. (*see* d.e. 41-3, Holmes Dep. Ex. 12; d.e. 42-5, Scott Dep. p. 20). Further, if requested by the employee, Alive Hospice also provided employees with an extra thirty (30) days of unpaid leave, preserving their full-time status and benefits. The employee could submit this request via a one-page form. (*see* d.e. 42-4, Scott Dep. pp. 15,16).

On January 21, 2010, Holmes did submit a formal request for FMLA, indicating "a serious health condition that [I] need care for." Specifically, Holmes' C5 vertebrae was pressing into her spinal cord, causing back pain and numbness and tingling in her hands, and she was preparing for surgery. (*see* d.e. 40-4, Holmes Dep. pp. 116,117; d.e. 41-3, Holmes Ex. 21). Her twelve-week FMLA leave commenced January 21, 2010. The surgery was performed by Peter Konrad, M.D., Ph.D. and successfully treated the medical issues Holmes was suffering from. (*see* d.e. 40-4, Holmes Dep. p. 137).

Holmes anticipated being released from Dr. Konrad's care on April 15, 2010, the date of a follow-up appointment with Dr. Konrad. This would have fallen squarely within the allotted twelve weeks of FMLA time, beginning January 21 and set to expire April 15, 2010. However, he felt the vertebrae in her neck were not fusing properly and Dr. Konrad recommended that Holmes remain off work for an additional four weeks, until May 17, 2010. (*see* d.e. 40-4, Holmes Dep. p. 125; d.e. 41-3, Holmes Ex. 25) Dr. Konrad filled out a note to that effect and Holmes brought it to Scott at Alive Hospice on April 15, 2010. (*see* d.e. 40-4, Holmes Dep. p. 125,126; d.e. 42-5, Scott Dep. p. 32, 33).

Under Alive Hospice policy, Holmes was eligible for an additional thirty (30) days of leave. (*see* d.e. 42-4, Scott Dep. pp. 15,16; Handbook p. 20). Holmes believed that the thirty days would start on April 16, the day after her FMLA leave ended (*see* d.e. 40-4, Holmes Dep. pp.

5

126,127). The form requesting the leave was completed by human resources representative Scott, who calculated that the thirty-day leave would begin on April 4, 2010 (a Sunday) and end on May 3, 2010. Scott wrote her calculation on the bottom of the form. (*see* d.e. 41-3, Holmes Dep. Ex. 24). However, Scott counted the 11 days of PTO and ESB leave Holmes used in December (December 3 to December 14, 2009) toward the total FMLA leave. According to Scott's calculation, and including the leave of absence in December, Holmes' FMLA should have already ended on April 3, 2010. (*see* 40-4, Holmes Dep. p. 126; d.e. 41-3, Holmes Ex. 24). Holmes pointed out the error to Scott and Guy but she signed the form, for fear of being terminated. (*see* d.e. 40-4, Holmes Dep. pp. 125,126,146,147). Holmes felt she had no choice but to sign the form in order to retain her job, even though the dates on the form were incorrect. (*see* d.e. 40-4 and 40-5, Holmes Dep. pp. 146, 147, 150, 171, 172).

Even if, pursuant to Scott's calculation, Holmes' FMLA leave had expired April 3, 2010, Alive Hospice did not contact Holmes or terminate Holmes for failing to contact them until April 15, 2010 to request an additional thirty days of leave to which she was entitled per policy. Alive Hospice seemingly allowed for a retroactive start date of the additional thirty days when Holmes signed the form on April 15, 2010, despite Holmes' protests that the eleven days of December 2009 leave should not count towards her FMLA. Holmes responsibly brought a note from her doctor on what she believed to be the last day of her FMLA leave, April 15, 2010, and it was not until this day Guy explained to her that Alive Hospice was considering the leave she had taken in December 2009 to be part of her FMLA leave. (*see* d.e. 40-4, Holmes Dep. pp. 125, 126). Even the FMLA Request submitted to and received by Human Resources indicated that Holmes' FMLA leave was to begin January 21, 2010 and end on April 15, 2010. (*see* d.e. 41-3, Holmes Dep. Ex. 21). Holmes was unaware that Scott purportedly sent to her FMLA forms to sign and

6

return to Human Resources in December 2009; she never received them. (*see* d.e. 40-3, Holmes Dep. p 111). Scott cannot recall if the FMLA forms she allegedly mailed to Holmes on December 8, 2009 were received by Holmes, and confirmed with a certified mail receipt. She cannot remember if Holmes completed the forms and returned them to her. (*see* d.e. 42-5, Scott Dep. pp. 21,22). Scott never received any specific training or education regarding employees who needed an accommodation or as to the law regarding FMLA leave. (*see* d.e. 42-5, Scott Dep. pp. 18, 21).

At the end of her additional thirty day leave, on or around May 4, 2010, Alive Hospice changed Holmes from a full-time employee to PRN (on-call, as needed) status. (*see* d.e. 42-4 and 42-5, Scott Dep. pp. 16, 26). This was not a policy. (*id.* Scott Dep. p. 16). Holmes was advised that Alive Hospice could do this but did not know for certain that her status had been changed. (*see* d.e. 40-5, Holmes Dep. p. 153, 154). Alive Hospice still did not terminate Holmes at this time, despite the fact she had exhausted her FMLA leave and additional thirty day leave. Holmes was converted PRN status after exhausting all forms of leave in an effort to hold her close to Alive Hospice, supposedly with the hope she could come back to work in some capacity. (*see* d.e. 42-4, Scott Dep. p. 16). This was not a policy.

On May 17, 2010, Holmes visited her doctor but once again, he did not release her to work, as she expected. He recommended another two weeks off of work, until May 26, 2010. Holmes submitted her last medical release from her doctor, releasing her for duty with no restrictions and making her available to work on May 26, 2010. (*see* d.e. 41-3, Holmes Dep. Ex. 27, p. 6). This was Holmes' request for additional leave from work. At that point Alive Hospice knew her exact return to work date.

7

On or around May 27, 2010, Holmes spoke to Scott and asked if she needed to contact Owens about being scheduled to work, and Scott told her no, she would let Owens know that Holmes was available to work. (*see* d.e. 40-5, Holmes Dep. p. 155; d.e. 42-2, Owens Dep. p. 30).

Holmes did not hear from Owens, so at the beginning of June she called Owens to inquire about available shifts. Owens told Holmes she did not have any work available (*see* d.e. 42-1, Owens Dep. p. 21). However, when Holmes called in again to inquire about available shifts, she reached Mayberry, also an LPN, who told her that there were open shifts, with LPN availability. (*see* d.e. 41-4, Mayberry Dep. p. 11-13; d.e. 40-5, Holmes Dep. p. 155). An RN had to be on-duty at all times in the call center, and Alive Hospice preferred RN's to staff the call center, but an LPN could work so long as an RN was there. (*see* d.e. 41-4, Mayberry Dep. p. 12).

There was no lack of work in the call center. (*see* d.e. 41-4, Mayberry Dep. pp. 12, 17). However, while Holmes was out on leave, on or around May 24, 2010, Owens was instructed to staff the call center with only two employees per shift, rather than three. (*see* 42-2, Owens Dep. pp. 28, 29; d.e. 41-4, Mayberry Dep. p. 22). One call center shift was placed on hold "per Jason." (May 24, 2010 email from Guy to Owens, Bates no. D000310). This was communicated to Owens by Courtney Gift, an HR specialist, contrary to Owens' deposition testimony that her supervisor, Ann Chance ("Chance") had relayed the information to her. (*see* d.e. 42-2, Owens Dep. pp. 28, 29; May 24, 2010 email from Owens to Guy, Bates no. D000311). In his email, Guy apologizes that it was not communicated to Owens sooner, since the decision had been made May 6th. He further states in his email that he will follow up with Chance, Owens' supervisor, on the status of this position. (May 24, 2010 email from Guy to Owens, Bates no. D000310). The downsizing was purportedly due to 'finances'. (*see* d.e. 42-2, Owens Dep. p. 28, 29) Holmes did not know that a position had been eliminated. (*see* d.e. 40-5, Holmes Dep. p. 162).

8

After she learned about the elimination of one call center position, Owens emailed Human Resources. There was work available, and Owens was scrambling to cover it. She was having difficulty keeping day call center shifts covered. (May 24, 2010 email from Owens to Guy, Bates no. D000311). She indicated that the situation was "not an optimal way to cover this and do it the way it needs to be done." (*id.*) Also, she had on staff an RN (Amanda Rigsby) who did not have any availability, and she had Darlene Lowe, an LPN who could not meet scheduling needs. (*see* d.e. 42-2, Dep. Owens pp. 40,41). Owens later terminated Rigsby for her unavailability, and Lowe resigned. Owens states that there was work, but those two employees were not available to work the shifts for which they were needed so she terminated one and the other resigned. (*id.* Owens Dep. pp. 40, 41).

Just three days after Owens emailed Human Resources about the staffing shortage in the call center, Holmes was released from work and available to work on May 27, 2010. She called Alive Hospice to notify them of same but was not scheduled for any shifts. (*see* d.e. 40-5, Holmes Dep. p. 155).

Holmes was terminated on July 23, 2010, for "not working any shifts." (*see* d.e. 42-3, Owens Dep. Ex. 1). Specifically, she was terminated for not working at least two shifts in a thirty-day period, according to Alive Hospice policy. (*see* d.e. 42-5, Scott Dep. p. 30).

Holmes was surprised by her termination, since Mayberry had relayed to her that there were shifts available in the call center. (*see* d.e. 41-4, Dep. Mayberry 11 – 13). Also, Holmes had taken personal leave once before and was not terminated. In or around June 2008, when Holmes was a PRN employee with Alive Hospice continuous care, she took four to five months leave from work for personal issues. She did not work any shifts during those four to five months, and she was not terminated. In fact, it was Owens who called her in December, 2008, and asked her

if she wanted to work. (*see* d.e. 40-5, Holmes Dep. pp. 163-166; d.e. 42-1, Owens Dep. p. 11). Holmes returned to work with no repercussions, and just a few months later applied for and received a permanent position in the call center.

Owens stated in her deposition that did not discuss her decision to terminate Holmes with anyone in Human Resources prior to turning in the Personnel Action Form ("PAF") terminating Holmes on July 23, 2010. (*see* d.e. 42-3, Owens Dep. p. 64, 65). However, the day before, on July 22, 2010, human resources representative Guy was made aware via email that Holmes had applied as an internal candidate for a Revenue Cycle Specialist position at Alive Hospice, in an effort to obtain full-time work. (July 22, 2010 email from Kathi Morgan ("Morgan") to Guy, Bates no. D000312). This email was received at 3:28 p.m. He replied to Morgan and stated, "We should discuss." At 3:29 p.m., just one minute later, he sent Owens an email requesting she send him a "term PAF on Martha Kay Holmes, for not working shifts." (July 22, 2010 email from Guy to Owens, Bates no. D000313). A "term PAF" is a Personnel Action Form that terminates the employee.

Morgan was the Revenue Cycle Manager at Alive Hospice. She received Holmes' application for the position of authorization nurse coordinator in June 2010. Because Holmes was an internal applicant, Morgan contacted Human Resources for additional information about her credentials and experience at Alive Hospice. (July 22, 2010 email from Morgan to Guy, Bates no. D000312). When Morgan spoke to Guy in person at some point after sending the email to him, Guy told her that Holmes currently worked in the call center, but did not relate any performance or disciplinary issues regarding Holmes. He didn't mention suspending or terminating Holmes, despite requesting her termination PAF from Owens perhaps minutes

beforehand. (*see* d.e. 41-5 and 41-6, Morgan Dep. pp. 17, 18; July 22, 2010 email from Guy to Owens, Bates no. D000313; July 22, 2010 email from Guy to Owens, Bates no. D000313).

Scheduling was completely passive on Holmes' part, but she had been calling in to the call center to see if any shifts were available and had made it known that she was available for work. (*see* d.e. 40-5, Holmes Dep. pp. 155, 158; d.e. 41-4, Mayberry Dep. p. 11; d.e. 42-1, Owens Dep. p. 21). Owens was in charge of scheduling call center nurses, and would have been the person responsible for scheduling Holmes. (*see* d.e. 42-1, Owens Dep. p. 23). As a PRN, Holmes was required to work at least two (2) shifts per month, but Holmes was not given the opportunity by Owens to work any of the available shifts. (*see* d.e. 42-6, Guy at ¶ 4; d.e. 42-3, Owens Dep. p. 67). Owens states that she did not schedule Holmes because she needed RN's, rather than an LPN such as Holmes, but also emailed Human Resources during this time frame and states that she is having trouble keeping the call center staffed. (May 24, 2012 email from Owens to Guy, Bates no. D000311). She had also just lost an LPN, Darlene Lowe, who had resigned because she could not meet the staffing needs of the call center. (*see* d.e. 42-2, Owens Dep. p. 41). Still, Owens did not call Holmes.

Owens simply did not want Holmes to come back and work for her. Owens alleges that Holmes' behavior was erratic, that she was moody, and was hateful and disrespectful toward her. (*see* d.e. 42-3, Owens Dep. p. 67). Owens alleges she had previously addressed her concerns with Human Resources, and with Holmes herself, but did not document this verbal discussion as evidence of possible progressive discipline. (*id.* Owens Dep. p. 61). Holmes never received any corrective action pursuant to the Employee Discipline policy and procedure as outlined in Section 8 of the Employee Handbook. (Handbook, pp. 32 – 34). There are no notes documenting a verbal warning or a written warning to Holmes.

Owens relied on the aforementioned policy (working at least two shifts in thirty days) to orchestrate Holmes' termination. It is unknown how Guy became aware of Holmes' failure to work at least two shifts in thirty days, prior to his email requesting a term PAF from Owens. Owens stated in her deposition that she did not discuss her decision to terminate Holmes with anyone in Human Resources prior to turning in the Personnel Action Form ("PAF") terminating Holmes on July 23, 2010. (*see* d.e. 42-3, Owens Dep. p. 64, 65). In her deposition, she states nobody had to tell her to take [this] action, it was something she could do. (*see* d.e. 42-2, Owens Dep. p. 39). However, Guy told her to send him the term PAF on July 22, 2010. (July 22, 2010 email from Guy to Owens, Bates no. D000313).

Holmes' termination was contrary to Alive Hospice policy, which states that it will strive to return employees to their regular job duties as quickly as possible with written medical release. (Handbook, pp. 22, 23). Holmes was converted PRN status after exhausting all forms of leave in an effort to hold her close to Alive Hospice, supposedly with the hope she could come back to work in some capacity. (*see* d.e. 42-4, Scott Dep. p. 16). Holmes was released to return to work on May 26, 2010, and so called Alive Hospice to inquire about work. (*see* d.e. 40-5, Dep. Holmes p. 155). It appears Alive Hospice did not want to hold her close, and Holmes was not offered any work after her release on May 26, 2010.

If not for her disability and extended absence from work, Holmes would not have been converted to PRN status or terminated. She was not afforded an opportunity to return full-time, as she had been previously in 2008. Owens controlled the staffing of the call center, and despite the loss of two employees who could not meet the scheduling requirements, she did not call Holmes to return to work.

**II.     Argument**

## A.      Standard of Review

Defendant as moving party has the initial burden of showing the Court, by reference to the record, the basis for the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When the non-moving party has the burden of proof at trial, the movant must carry the initial burden in one of two ways: either by negating an essential element of the non-movant's case or by showing that there is no evidence to support a fact necessary to the non-movant's case. *See Clark v. Coats & Clark, Inc.*, 929 F. 2d 604, 606-08 (11th Cir. 1991). Before the Court can evaluate the Plaintiffs' opposition to the motion, it must first determine whether the Defendant has met its initial burden of showing that there are no issues of material fact and that Defendant is entitled to judgment as a matter of law. *Jones v. City of Columbus*, 120 F. 3d 248, 254 (11th Cir. 1997) (per curiam). Bold, conclusory statements that the Plaintiffs cannot meet their burden at trial are insufficient. Only after the movants have met their initial burden does the burden shift to the non-moving party to "demonstrate that there is indeed a material issue of fact that precludes summary judgment." 929 F. 2d at 608.

As the Supreme Court stated in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986), summary judgment is inappropriate unless the evidence is so one-sided that a reasonable jury could arrive at only one conclusion. 477 U.S. at 251-252. "**Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge.**" *Id.* at 255. (Emphasis added). In ruling on a motion for summary judgment, the Court should never weigh the evidence or find the facts. Instead the Court's role under F.R.C.P. 56 is narrowly limited to assessing the threshold issue of whether a genuine issue exists as to material facts requiring a trial. *Id.* at 249. Thus, the evidence of the non-moving party will be believed as true, all doubts will be resolved against the moving party,

all evidence will be construed in the light most favorable to the non-moving party, and all reasonable inferences will be drawn in the non-moving party's favor. *See Hunt v. Cromartie*, 526 U.S. 541, 550-555 (1999); *Eastman Kodak Co. v. Image Technical Servs.*, *Inc.*, 504 U.S. 451, 456 (1992); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); and *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157-159 (1970).

Reasonable inferences are inferences reasonably drawn from all facts then before the Court, after sifting through universe of all possible inferences the facts could support. Reasonable inferences are not necessarily more probably or likely than other inferences that might tilt in the moving party's favor. Instead, so long as more than one reasonable inference can be drawn, and that inference creates a genuine issue of material fact, the trier of fact is entitled to decide which inference to believe and summary judgment is not appropriate. *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999); *Patterson & Wilder Const. Co., Inc. v. United States*, 226 F.3d 1269, 1273 (11th Cir. 2000).

Based on the above referenced standard, it is clear that questions concerning the credibility of witnesses are not normally disposable upon motion for summary judgment. Further, it is well established that questions concerning a person's state of mind (such as motive, knowledge, intent, good faith or bad faith, malice, fraud, conspiracy or consent) are rarely disposable at the summary judgment stage. *See Hutchinson v. Proxmire*, 443 U.S. 111 (1979); *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2nd Cir. 2000) (commenting that summary judgment is used "sparingly" where intent and state of mind are implicated); *EMI Catalogue Partnership v. Hill, Holliday, Conners, Cosmopulos, Inc.*, 228 F.3d 56, 61 (2nd Cir. 2000) ("caution" must be observed with issues involving a defendant's intent); *Seamons v. Snow*, 206 F.3d 1021, 1027-1028 (10th Cir. 2000) (noting that grant of summary judgment is "especially

14

questionable" in cases delving into a party's state of mind); *United States, ex rel. Cantekin v. University of Pittsburgh*, 192 F.3d 402, 411 (3rd Cir. 1999) (noting the "basic rule" that state of mind issues typically should not be decided on summary judgment); *Mendocino Envt'l Ctr. v. Mendocino County*, 192 F.3d 1283, 1302 (9th Cir. 1999) (observing that state of mind questions are factual issues inappropriate for summary judgment); *Geier v. Medtronic, Inc.*, 99 F.3d 238, 240 (7th Cir. 1996) (applying summary judgment standard with special scrutiny where cases turn on issues of intent and credibility); *Hossaini v. Western Missouri Med. Ctr.*, 97 F.3d 1085, 1088 (8th Cir. 1996) (recognizing the difficulty of disposing intent issues at the summary judgment stage).

### B. Defendant discriminated against Holmes by failing to offer extended leave

It is well-settled that leave can be a reasonable accommodation under the ADA. The EEOC has spoken extensively about the topic. For example, in its Interpretive Guidance on Title I of the ADA ("Interpretive Guidance"), the EEOC identifies as possible reasonable accommodations "permitting the use of accrued paid leave or providing additional unpaid leave for necessary treatment." 29 C.F.R. Pt. 1630 App. § 1630.2(o). Leave has also been explicitly identified as a reasonable accommodation under the ADA in nearly every circuit. *Garcia-Ayala v. Lederle Parenterals, Inc.* 212 F.3d 638, 648-50 (1st Cir. 2000); *Graves v. Finch Pruyn & Co., Inc.*, 457 F.3d 181, 185 & n.5 (2d Cir. 2006); *Walton v. Mental Health Ass'n of Southeastern Pa.*, 168 F.3d 661, 671 (3d Cir. 1999); *Myers v. Hose*, 50 F.3d 278 (4th Cir. 1995) (rejecting unaccrued paid leave as a reasonable accommodation, but citing with approval the EEOC Interpretive Guidance regarding unpaid leave and accrued paid leave as reasonable accommodations); *Cehrs v. Nw. Ohio Alzheimer's Research Ctr.*, 155 F.3d 775, 781-83 (6th Cir.

1998); *Haschmann v. Time Warner Ent Co.*, 151 F.3d 591, 601 (7th Cir. 1998); *Browning v. Liberty Mut. Ins. Co.*, 178 F.3d 1043, 1049 n.3 (8th Cir. 1999); *Nunes v. Wal-Mart Stores, Inc.*, 164 F.3d 1243, 1247 (9th Cir. 1999); *Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 955, 967 (10th Cir. 2002); *Holly v. Clairson Indus*, *LLC,* 492 F.3d 1247, 1263 (11th Cir. 2007); *Taylor v. Rice*, 451 F.3d 898, 910 (D.C. Cir. 2006).   Although for most jobs regular attendance at work is an essential function, where the reasonable accommodation requested is leave from work, regular attendance at work is not the relevant inquiry. *Shannon v. City of Philadelphia,* No. CIV.A. 98-5277, 1999 WL 1065210, \*5 (E.D .Pa. Nov. 23, 1999) (citing *Rascon v. U.S. West Commc'ns, Inc., 143 F.3d 1324, 1333 (10th Cir.1998)*) (other citations omitted).

        The only basis for a denial of leave as a reasonable accommodation is through a showing that it would be an undue hardship to the employer. 42 U.S.C. § 12112(b)(5)(A). Thus, a qualified individual with a disability is entitled to additional leave time beyond the twelve weeks permitted under the FMLA so long as that additional leave time would not constitute an undue hardship on the employer. *See* 29 C.F.R. § 825.702(b) ("[T]he ADA allows an indeterminate amount of leave, barring undue hardship, as a reasonable accommodation.").  When an employee requests time off for a reason related or **possibly related** to a disability, the employer should determine the employee's rights under all of the relevant statutes. The request should be deemed one for a reasonable accommodation under the ADA as well as a request for FMLA leave.  Thus, the employer should "initiate an informal, interactive process with the individual with a disability.   [to] identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." 29 C.F.R. § 1630.2(o)(3). In seeking leave as a reasonable accommodation, the employee need not show that the leave is certain or even likely to be successful to prove that it is a reasonable accommodation, only that it

16

would plausibly enable the employee to return and perform his job. *Humphrey v. Memorial Hospitals Ass'n*, 239 F.3d 1128, 1136 (9th Cir. 2001). It was not a hardship to Alive Hospice; in fact they were understaffed due to a sudden reduction of one shift in the call center, and had just lost two employees. Owens was admittedly struggling to cover shifts in the call center; but she took the opportunity to serve her own interests in removing a capable, high-performing employee from Alive Hospice employ because of perceived negativity and attitude.

An employer must provide a reasonable accommodation to a qualified employee under the ADA unless the employer "can demonstrate that the accommodation would impose an undue hardship on the operation of its business." 42 U.S.C. § 12112(b)(5)(A); *see also* 29 C.F.R. § 1630.9(a). A requested accommodation would impose an "undue hardship" where it requires "significant difficulty or expense." 42 U.S.C. § 12111(10)(A); 29 C.F.R. § 1630.2(p)(1). The following factors are to be considered in determining whether an accommodation would impose an undue hardship:

> (i) The nature and net cost of the accommodation needed under this part, taking into consideration the availability of tax credits and deductions, and/or outside funding;

> (ii) The overall financial resources of the facility or facilities involved in the provision of the reasonable accommodation, the number of persons employed at such facility, and the effect on expenses and resources;

> (iii) The overall financial resources of the covered entity, the overall size of the business of the covered entity with respect to the number of its employees, and the number, type and location of its facilities;

> (iv) The type of operation or operations of the covered entity, including the composition, structure and functions of the workforce of such entity, and the geographic separateness and administrative or fiscal relationship of the facility or facilities in question to the covered entity; and

17

(v) The impact of the accommodation upon the operation of the facility, including the impact on the ability of other employees to perform their duties and the impact on the facility's ability to conduct business.

29 C.F.R. § 1630.2(p)(2).

Thus, a leave is more likely to be deemed an undue hardship the more complex the nature of the employee's work, the more difficult it would be to replace the employee, or the more difficult it would be to redistribute that employee's work. There was a need for staff in the call center, and Holmes had more than aptly demonstrated that she was capable of handling the day shift and competently performing her job. Alive Hospice exercised their *practice* of converting full-time employees to PRN once they had used up all available FMLA leave and the additional thirty days granted by policy. They did not terminate Holmes at this time. Holmes' supervisor then proceeded to use her PRN status to her advantage by claiming to not have available shifts in order to push Holmes out.

Alive Hospice clearly didn't think extending Holmes' leave past her allotted FMLA leave and additional thirty days was a hardship; particularly since her status had been reduced from full-time to PRN and her hours and pay adjusted accordingly. Since she would not be paid except for the hours she worked, Alive Hospice controlled the hours she worked, which is to say, none at all.

Guy states in his affidavit that "Holmes never requested any accommodation including a request for an extended leave of absence beyond the twelve (12) weeks of FMLA leave and the additional thirty (30) days of leave provided by Alive Hospice. Had she done so, Alive Hospice would have requested medical information from Ms. Holmes' physician and then evaluated her request. (*see* d.e. 42-6, Guy at ¶ 10). However, Holmes submitted her last medical release from her doctor on May 17, 2010, making her available to work on May 26, 2010. (*see* d.e. 41-3,

Holmes Dep. Ex. 27, p. 6).  This was Holmes' request for additional leave from work. At that point Alive Hospice knew her exact return to work date and they made no effort to obtain additional medical information. They then punished her for this needed leave by failing to schedule her after May 26, 2010, when she was cleared to return to work.

An employee requesting a reasonable accommodation, such as a leave, need only show that the requested accommodation is "reasonable on its face, *i.e.*, ordinarily or in the run of cases." *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 401-02 (2002). Once that is accomplished, the employer must engage the interactive process and either grant the request, or "show special (typically case-specific) circumstances that demonstrate undue hardship in the particular circumstances." *Id.* at 402.  The requested accommodation here appears reasonable on its face, as a number of courts and other authority have recognized that a leave of absence for medical treatment may constitute a reasonable accommodation under the ADA. *See, e.g., Wilson v. Lemington Home for the Aged,* 159 F.Supp.2d 186, 201 (W.D.Pa.2001)(recognizing that medical leave of absence can be a reasonable accommodation) (citing *Basith v. Cook County,* 241 F.3d 919, 932 (7th Cir.2001); *Humphrey v. Mem. Hospitals Ass'n,* 239 F.3d 1128 (9th Cir.2001); *Criado v. IBM Corp.,* 145 F.3d 437 (1st Cir.1998) ("stating that leave may constitute reasonable accommodation"); *Cehrs v. Ne. Ohio Alzheimer's Research Ctr.,* 155 F.3d 775, 782 (6th Cir.1998) (citing *Criado, supra; Rascon v. U.S. West Commc'ns, Inc.,* 143 F.3d 1324, 1334 (10th Cir.1998) ("stating that 'time for medical care or treatment may constitute a reasonable accommodation' "); *Dockery v. North Shore Med. Ctr.,* 909 F.Supp. 1550, 1560 (S.D.Fla.1995) ("recognizing that unpaid leave may constitute reasonable accommodation"); *Schmidt v. Safeway, Inc.,* 864 F.Supp. 991, 996 (D.Or.1994) ("reasonable accommodation may include leave of absence for treatment")). In addition to the above authority, the Interpretive Guidance on

Title I of the ADA provides that a reasonable accommodation could include "additional unpaid leave for necessary medical treatment." 29 C.F.R. pt. 1630, app. § 1630.2(o). Similarly, the regulations promulgated by the Department of Labor indicate that a reasonable accommodation may require an employer "to grant liberal time off or leave without pay when paid sick leave is exhausted and when the disability is of a nature that it is likely to respond to treatment of hospitalization." 29 C.F.R. pt. 32, app. A(b).

The employer's duty to participate in a good faith interactive process is triggered upon receiving notice of an employee's disability and request for accommodation. *Taylor,* 184 F.3d 314. The regulations implementing the ADA clearly establish that the "purpose of the interactive process is to determine the appropriate accommodations: 'This process should identify the precise limitations resulting from the disability and the potential reasonable accommodations that could overcome those limitations.' " *Id.* at 316 (quoting 29 C.F.R. § 1630.2(o)(3)). Although the interactive process contemplates a good faith exchange of information on both sides, the courts have interpreted the regulations to place the burden on employers to take the initiative and request additional information that it believes it needs. *Id.* at 315.

The Court of Appeals in *Taylor* reasoned that "[t]he interactive process would have little meaning if it was interpreted to allow employers, in the face of a request for accommodation, simply to sit back passively, offer nothing, and then, in post-termination litigation, try to knock down every specific accommodation as too burdensome. That's not the proactive process intended: it does not help avoid litigation by bringing the parties to a negotiated settlement, and it unfairly exploits the employee's comparative lack of information about what accommodations the employer might allow." *Id.* 315-16 (footnote omitted). Nonetheless, since participation is the obligation of both parties, the employer will have fulfilled

its obligation if, after conferring with the employee to find possible accommodations, the employee fails to supply requested and/or necessary information. *Id.* at 317. In all events, the interactive process does not alleviate the employee's burden of proving that a particular accommodation rejected by the employer would have made the employee qualified to perform the job's essential functions. *Id.* (citing *Walton,* 168 F.3d at 670). However, the accommodation at issue, a little more time to heal under a policy the Defendant had used in the past, would have qualified her to perform the essential functions of her job.

To establish that an employer failed to participate in the interactive process, a disabled employee must prove: "1) the employer knew about the employee's disability; 2) the employee requested accommodations or assistance for his or her disability; 3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and 4) the employee could have been reasonably accommodated but for the employer's lack of good faith" *Id.* at 319-20 (citing *Mengine,* 114 F.3d at 420; *Bultemeyer v. Fort Wayne Comm. Sch.,* 100 F.3d 1281, 1285 (7th Cir.1996); *Taylor v. Principal Fin. Group, Inc.,* 93 F.3d 155, 165 (5th Cir.1996)). On the other hand, employers can demonstrate that they participated in good faith in the interactive process by showing, for example, that they met with the employee who requested the accommodation, requested information about the condition and what limitations the employee has, asked the employee specifically what she wanted, that they considered the employee's request, and offered and discussed available alternatives when the request is too burdensome. *Id.* at 317 (citing 29 C.F.R. pt. 1630, app. § 1630.9). Alive Hospice did not in good faith accommodate Holmes; they converted her to PRN status but never offered her any shifts after May 26, 2010. Holmes believed she was still employed, and was still employed by Alive

Hospice, but the Defendant took advantage of that belief and purposefully did not schedule her due her FMLA leave and perceived disability.

The ADA does not identify any amount of leave time that would automatically be deemed an undue hardship. *See Garcia-Ayala v. Lederle Parenterals, Inc.,* 212 F.3d 638, 50 (1st Cir. 2000) (stating that "[t]hese are difficult, fact intensive, case-by-case analyses, ill-served by per se rules or stereotypes" and holding that plaintiff's request for an additional two-month leave after 15 months of leave did not constitute undue hardship).

"Modifying workplace policies, including leave policies, is a form of reasonable accommodation." *Id.*; *see also Barnett*, 535 U.S. at 397-98 (stating that an employer may be required to modify a disability-neutral policy so as to create a reasonable accommodation for an employee).  Even if the employer is generous in the amount of leave time it permits (for example, permitting employees on short term disability to be out on leave for a year), a maximum leave policy does not satisfy an employer's obligation to provide a reasonable accommodation to an employee who needs additional leave.  According to the EEOC, modification to "no-fault' leave policies of employers, such as the one in effect at Defendant in 2009, is a form of reasonable accommodation. *See EEOC Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act,* 2002 WL 31994335, \*15, 19 (Oct. 17, 2002) (" *EEOC Enforcement Guidance* "). Indeed, the *EEOC Enforcement Guidance* provides that "[i]f an employee with a disability needs additional unpaid leave as a reasonable accommodation, the employer must modify its "no-fault" leave policy to provide the employee with the additional leave, unless it can show that: (1) there is another effective accommodation that would enable the person to perform the essential functions of his/her position, or (2) granting additional leave would cause an undue hardship." *Id.* Therefore,

the fact that Holmes could not return to work in any capacity at the expiration of her FMLA leave is not dispositive of whether she is a "qualified individual."

Often times, an employee (or her physician) cannot give a precise date when she will be able to return to work. An employer has no obligation to provide an indefinite leave. *See, e.g.*, *Myers*, 50 F.3d at 280 (holding that employer has no obligation to provide an employee with an indefinite leave). A leave request is not "indefinite" simply because the nature of the employee's condition is such that only an approximate return date is provided. *See Garcia-Ayala*, 212 F.3d at 648-50 (discussing difference between indefinite leave and one with approximate or revised return dates).

As shown, at the very least there exist genuine issues of material fact as to whether Defendant discriminated against Holmes and failed to provide her a reasonable accommodation. Alive Hospice states that Holmes was terminated for failing to work two shifts in a thirty day period. It then states that Holmes cannot establish that Owens' reasons that she did not schedule Holmes in the call center had no basis in fact, did not motivate or were insufficient to motivate Owens' actions. It seems Owens did not schedule Holmes not because there was a lack of work as stated on the PAF, but because she perceived Holmes disabled or requiring leave. There is a paradox: either there was a lack of work, or Owens took the opportunity after Holmes was reduced to PRN to discriminate and retaliate against Holmes by not scheduling her, and thus invoke the policy of termination after failing to work two shifts in thirty days, and thus discriminate against her because she had to take disability leave due to her condition. That there was *not* a "lack of work" has been established, through the testimony of Mayberry and Owens' own emails imploring Human Resources for advice on how to cover the shifts in the call center.

**C . Defendant retaliated against Holmes for exercising her FMLA rights**

23

As the Sixth Circuit has observed, a key distinction between an interference-based and a retaliation-based FMLA claim concerns the issue of the employer's motivation for its actions. While "[t]he employer's intent is not a relevant part" of an FMLA interference claim, "the employer's motive is an integral part of the analysis" of a claim of retaliation. Edgar v. JAC Products, Inc., 443 F.3d 501, 507-08 (6th Cir.2006). Hence, a plaintiff may recover under a retaliation theory only by showing "that the action was taken because the employee exercised, or complained about the denial of, FMLA-protected rights." Edgar, 443 F.3d at 512. Because of this element of employer motive, the courts analyze retaliation claims under the usual M*cDonnell Douglas* burden-shifting framework. *Edgar,* 443 F.3d at 512.

As for her interference claim, there is no dispute that Holmes requested time off to undergo surgery. But she was not restored to her previous, full-time, position. Upon return from FMLA leave, an employee must be restored to his or her original job, or to an **"equivalent"** job, which means virtually identical to the original job in terms of pay, benefits, and other employment terms and conditions. In addition, an employee's use of FMLA leave cannot result in the loss of any employment benefit that the employee earned or was entitled to before using (but not necessarily during) FMLA leave.

For her retaliation claim, Holmes must show that (1) she availed herself of a protected right under the FMLA, (2) she suffered an adverse employment action, and (3) that there was a causal connection between the exercise of her rights under the FMLA and the adverse employment action. *See Edgar v. JAC Products, Inc.*, 443 F.3d 501, 508 (6th Cir. 2006). Defendant only disputes the third element. As for motivation, it is undisputed that Owens and Holmes' working relationship was strained, but if Holmes had not required FMLA leave, and had continued working at her job without interruption, she would have remained a full-time employee of the call center. But when she requested FMLA, and that leave was extended, she

24

was relegated to PRN status, and never brought back to work. Owens took the opportunity to discriminate and retaliate against Holmes, despite the need for staffing the call center.

An employee may demonstrate that an employer's proffered, non- discriminatory reasons for an adverse employment action are pretextual by revealing the "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's explanation. Three of the most common ways to undermine an employer's proffered reasons include: (1) establishing that the proffered reasons have no basis in fact, (2) establishing that the proffered reasons did not actually motivate the adverse employment action, or (3) establishing that the proffered reasons were insufficient to motivate the adverse employment action.

Pretext may be shown either directly by persuading the trier of fact that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of belief. *Smith v. Chrysler Corp.*, 155 F. 3d 799, 805-806 (6th Cir. 1998) In other words, the plaintiff can establish pretext if the employer's stated reason for action had no basis in fact, did not actually motivate the decision, **or was never used in the past**. *Reeves v. Sanderson Plumbing Prods. Inc.*, 530 U.S. 133, 120 S.Ct. 2097 (2000).

Defendant had a history of providing the accommodation.   In fact, Holmes was the recipient of such accommodation, and had once before taken personal leave, as a PRN. She did not work when shifts were offered to her due to personal hardship. In 2008 Alive Hospice did not terminate her for failing to work at least two shifts per month. In fact, her supervisor, Jennifer Frampton, requested that Holmes return to full-time status without reapplying for the still open position. (June 22, 2008 Frampton email to Guy, Price and Scott, Bates no. D000299).

Defendant states that it in this same time period, May 2010 to July 2010, it also terminated a female RN who "was not working shifts." (*see* d.e. 41, Def. Memorandum in

Support of its Motion for Summary Judgement, p. 10). But, Defendant terminated this RN because "She just didn't have any availability." (*see* d.e. 42-2, Dep Owens. p. 40). Plaintiff's counsel further asks, "There may have been work for her but she couldn't meet the schedule?" and Owens replies, "Right. Right. She was an RN." (*id.* Dep. Owens. p. 40, lines 23,24) It appears the RN was terminated because she could not meet the schedule at Alive Hospice, not because there was a lack of work.

Further, it is disingenuous for Defendant to state that Owens did not have any available shifts for LPN's. An LPN had just resigned. Owens had reached out to Human Resources for help, indicating that she did not agree with their elimination of a shift position in the call center. She stated that piece meal scheduling was "not an optimal way to cover this and do it the way it needs to be done." But when Holmes became available for work, Owens did not schedule her.

**D.      Defendant Has Failed to Meet Its Burden that It Is Entitled to Summary Judgment on Plaintiff's Regarded as Disabled Claims**

Under the ADA "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation**, job training, and other terms, conditions, and privileges of employment**." 42 U.S.C. § 12112(a). The term "disability" means, (A) a physical or **mental impairment** that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; **or (C) being regarded as having such an impairment.** 42 U.S.C. § 12102(1)(A)-(C). An individual may establish a disability under any one or more of these prongs. 29 CFR 1630.2(g)(2). The definition of disability "shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter." 42 U.S.C. § 12102(4)(A). Additionally, in amending the

26

ADA, Congress stated: **"If an individual establishes that he or she was subjected to an action prohibited by the ADA because of actual or perceived impairment -- whether the person actually has the impairment or whether the impairment constitutes a disability -- then the individual will qualify for protection under the Act."** 154 Cong. Rec. at S8842. *See also* 29 C.F.R. §1630.2(j)(1)(iii) (the primary object in cases brought under the ADA should be whether employers have complied with their obligations and whether discrimination occurred, not whether an impairment limits a major life activity which should not demand extensive analysis).

The term "'qualified individual' means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). The ADA requires the employee and employer to interact in good faith to determine the "precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." 29 C. F. R. § 1630.2(o)(3); *Lafata v. Church of Christ Home for the Aged,* 325 F. App'x 416, 422 (6th Cir. 2009). S*ee also Kleiber v. Honda of Am. Mfg., Inc.,*485 F.3d 862, 871 (6th Cir. 2007) ("the interactive process is mandatory, and both parties have a duty to participate in good faith."). Failure to engage in the interactive process can result in liability under the ADA if reasonable accommodations would have been possible. *Burress v. City of Franklin,* 2011 U.S. Dist. LEXIS 92668 *41 (M.D. Tenn. August 17, 2011) (citing *Lafata,* 325 F. App'x at 422). Moreover, **an employee is not required to use the "magic words" accommodation or disability** to trigger the required interactive process, asking for continued employment can be sufficient. *Burress,* 2011 U.S. Dist 9. LEXIS 92668 *41-42. (*emphasis added*)

Essential functions are "fundamental job duties of the employment position . . . not including] the marginal functions of the position." 29 C.F.R. § 1630.2(n)(1). A job function may

be essential where: (1) "the reason the position exists is to perform that function," (2) there are a "limited number of employees available among whom the performance of that job function can be distributed," (3) "[t]he function [is] highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function," or (4) for other reasons. 29 C.F.R. § 1630.2(n)(2)(i)-(iii). Essential functions are the critical job duties, while marginal functions are those tasks or assignments that are tangential.

The term substantially limits means "(i) Unable to perform a major life activity that the average person in the general population can perform; **or (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity."** 29 C.F.R. §1630.2(j)(1)(i)-(ii). Major Life Activities mean "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, **learning, and working.**" 29 C.F.R. §1630.2(i). (*emphasis added*)

To prove a **"regarded as"** claim under the ADA, as amended, plaintiff must show she was "subjected to an action prohibited under [the ADA] because of an actual or perceived physical or mental impairment **whether or not the impairment limits or is perceived to limit a major life activity**." 42 U.S.C. § 12102(3)(A) (2009). An impairment that is minor or transitory, having an actual or expected duration of six months or less, does not satisfy the "regarded as" prong. 42 U.S.C. § 12102(3)(B).

Direct evidence includes "evidence that the employer relied upon the plaintiff's disability in making its employment decision." *Monette,* 90 F.3d at 1185-86. Likewise, claims for failure

to accommodate are analyzed under the direct evidence framework. *Kleiber,* 485 F.3d at 868-869. To prove a claim of discrimination under the ADA using direct evidence, a plaintiff must show that she: (1) is disabled; (2) is otherwise qualified to perform the requirements of her position despite her disability, (a) without accommodation, (b) with an essential job requirement eliminated, or (c) with a proposed reasonable accommodation; and (3) the employer bears the burden of proving the a challenged job criterion is essential and a business necessity or that a proposed accommodation will impose and undue hardship. *Monette,* 90 F.3d at 1186. Direct evidence does not require the fact finder to draw any inferences to reach that conclusion. *Amini v. Oberlin Coll.,* 440 F.3d 350, 359 (6th Cir. 2006). Direct evidence is sufficient to defeat a motion for summary judgment in employment discrimination cases. *Swierkiewicz v. Sorema N. A.,* 534 U.S. 506, 511(2002).[1] An employer's discriminatory statements may form the basis for an inference of discrimination and establish pretext. In *Ash v. Tyson,* 546 U.S. 454, 126 S.Ct. 1195 (2006), the Court held that a manager's use of the word "boy" when referring to African Americans was evidence of discriminatory animus in the selection process. *Id.* at 1197. In

---

[1] To establish unlawful discrimination by indirect evidence, the employee must first establish a *prima facie* case of discrimination. *Monette,* 90 F.3d 1173, 1186. The employee may establish a *prima facie* case of discrimination by showing that (1) he is disabled within the meaning of the ADA; (2) he is "otherwise qualified" to perform the job in question with or without a reasonable accommodation; and (3) the defendant either refused to make a reasonable accommodation for his disability or made an adverse employment decision regarding him solely because of his disability. *Monette,* 90 F.3d at 1178. Once the employee successfully makes out a *prima facie* case, a mandatory presumption of discrimination is created and the burden shifts to the employer to proffer a non-discriminatory reason for discharging the employee. *Id.* at 1185. If the employer is able to sustain its burden the burden shifts back to the employee to show by a preponderance of the evidence that the employer's proffered reason for discharge was actually a pretext intended to hide unlawful discrimination. *Id.* at 1186. A showing of pretext can be made by demonstrating the proffered reason: (1) has no basis in fact, (2) was not the actual reason, or (3) is insufficient to explain the employer's action. *Imwalle v. Reliance Med. Prods., Inc*., 515 F.3d 531, 545 (6th Cir. 2008).

Case 3:11-cv-00594  Document 46  Filed 12/21/12  Page 29 of 35 PageID #: 953

*Ross v. Campbell Soup, Co.*, 237 F.3d 701 (6th Cir. 2001), the Court held that statements made were sufficient to establish a genuine issue of pretext in a "regarded as" disability case.

**Plaintiff's indirect evidence of disability discrimination is sufficient**

**to deny Defendant's Motion for Summary Judgment**

Under the indirect evidence method, the employee must first establish a prima facie case of discrimination. *Monette v. Elec. Data Sys Corp.*, 90 F.3d 1173, 1186 (6th Cir. 1996). The employee may establish a *prima facie* case of discrimination by showing the (1) she is disabled within the meaning of the ADA; (2) she is otherwise qualified the job is question with or without a reasonable accommodation; and (3) the defendant either refused to make a reasonable accommodation for her disability or made an adverse employment decision regarding her solely because of her disability. *Smith v. Ameritech*, 129 F.3d 857, 866 (6th Cir. 1997). Adverse employment actions can be characterized as a less distinguished title, significantly diminished material responsibilities, or other indices that might be unique to a particular situation. *Smith v. City of Salem, Ohi,* 378 F.3d 566, 575 (6th Cir. 2004); *White v. Burlington N. & Santa Fe R. Co.,* 364 F.3d 789, 799 (6th Cir. 2004). Once the employee successfully makes out a *prima facie* case, a mandatory presumption of discrimination is created and the burden shifts to the employer to proffer a non-discriminatory reason for discharging the employee. *Monette* at 1185. If the employer is able to sustain its burden, then the mandatory presumption evaporates into a permissive inference, and the burden shifts back to the employee to show by a preponderance of the evidence that the employer's proffered reason for discharge was actually a pretext intended to hide unlawful discrimination. *Id.* at 1186.

**1.  Defendant Regarded Plaintiff as Disabled**

Holmes' extended leaves of absence were for a serious medical condition, and Scott and Owens regarded her as disabled. They as were aware of Holmes' reasons for leave: Scott via the doctor's notes provided to her; and Owens by way of a phone call to Holmes while Holmes was out of FMLA leave, to see how she was doing. (*see* d.e. 42-1, Dep. Owen p. 16).

### 2. Plaintiff was Qualified to Perform the Requirements of Her Position

To meet the second prong of the analysis, the facts demonstrate that Plaintiff was otherwise qualified to perform the requirements of her position without any reasonable accommodation. *Monette,* 90 F.3d at 1186; *Burress,* 2011 U.S. Dist. LEXIS 92668 *41-42. Plaintiff was qualified for the position of PRN, as evidenced by Defendant's conversion to PRN status. In addition, Plaintiff was exceeding the expectations of Defendant in the position she held prior to taking medical leave.

### 3. Defendant Cannot Demonstrate Business Necessity or Undue Hardship

The EEOC guidance on Reasonable Accommodation and Undue Hardship under the Americans with Disabilities Act (EEOC Oct. 22, 2002) and the Code of Federal Regulations provide guidance on several factors that should be considered in making an undue hardship determination. Onlineat http://www.eeoc.gov/policy/docs/accommodation.html. 29 C.F.R. §1630.0(p)(2)(i)-(v). They include:

- o the nature and cost of the accommodation needed;
- o the overall financial resources of the facility making the reasonable accommodation; the number of persons employed at this facility; the effect on expenses and resources of the facility;
- o the overall financial resources, size, number of employees, and type and location of facilities of the employer (if the facility involved in the reasonable accommodation is part of a larger entity);
- o the type of operation of the employer, including the structure and functions of the workforce, the geographic separateness, and the

administrative or fiscal relationship of the facility involved in making the accommodation to the employer;

o   the impact of the accommodation on the operation of the facility.

It was not an undue hardship to provide Plaintiff with an additional nine days of leave, as they had done in the past. Further, after nine days, Plaintiff was available and ready to work, and Alive Hospice needed the staff, due to a high volume of calls in the center and staff attrition.

### E.  Defendant's Alleged Legitimate Non-Discriminatory Reason
### Was a Mere Pretext for Discrimination

Once a *prima facie* case is established, Defendant has the burden of articulating a legitimate, non-discriminatory reason for taking its adverse employment action.  If Defendant demonstrates such, Plaintiff then assumes the burden of showing that the reasons given by Defendant were a pretext for retaliation.

Accordingly, at this stage the burden shifts to Defendant, which must demonstrate a legitimate business reason justifying its action.

An employee may demonstrate that an employer's proffered, non- discriminatory reasons for an adverse employment action are pretextual by revealing the "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the employer's explanation. Three of the most common ways to undermine an employer's proffered reasons include: (1) establishing that the proffered reasons have no basis in fact, (2) establishing that the proffered reasons did not actually motivate the adverse employment action, or (3) establishing that the proffered reasons were insufficient to motivate the adverse employment action.

Pretext may be shown either directly by persuading the trier of fact that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's

proffered explanation is unworthy of belief. *Smith v. Chrysler Corp.*, 155 F. 3d 799, 805-806 (6th Cir. 1998)  In other words, the plaintiff can establish pretext if the employer's stated reason for action had no basis in fact, did not actually motivate the decision, **or was never used in the past**. *Reeves v. Sanderson Plumbing Prods. Inc.*, 530 U.S. 133, 120 S.Ct. 2097 (2000).

The only reason for the reduction of a shift in the call center is stated by Owens, who testifies the reduction was due to finances. Holmes had previously taken a four or five month leave of absence with no repercussions. Owens was reaching out to Human Resources because she was struggling to staff shifts in the call center. All of this indicates that there was no reason to not reinstate Holmes and that there was no "lack of work".

It appears Alive Hospice did not intend for Holmes to work there again; by conveniently concealing their intent utilizing a PRN status caused by an extended leave of absence, and an alleged lack of work, they orchestrated her termination. Mere minutes after he became aware of her application for a full-time position as authorization nurse coordinator, Guy told Owens to send her a term PAF for Holmes, and Owens happily obliged.

## Conclusion

WHEREFORE, Plaintiff responds in opposition to Defendant's Motion for Summary Judgment and requests that this Honorable Court deny said motion due to inconsistencies and discrepancies in the testimony and evidence as outlined therein.

Respectfully submitted,


     s/Andy L. Allman
Andy L. Allman, BPR No. 17857
ANDY L. ALLMAN & ASSOCIATES
103 Bluegrass Commons Blvd.
Hendersonville, TN 37075
Telephone:  (615) 824-3761
Facsimile:  (615) 264-2720
andylallman@comcast.net

     s/Andrew C. Clarke
Andrew C. Clarke, BPR No. 15409
6250 Poplar Avenue, Second Floor
Memphis, Tennessee 38119
Telephone:   (901) 590-0761
Facsimile:   (901) 590-0776
aclarke@accfirm.com

*Counsel for the Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that the foregoing, *Plaintiff's Response to Defendant's Motion for Summary Judgment,* has been filed by electronic means via the Court's electronic filing system this 21st day of December, 2012 and delivered electronically to:

Katherine C. Hart Smith (OH0040374)
Hart Smith Law Office
159 S. Main Street, Suite 1110
Akron, Ohio 44308
(330) 252-8050 (330) 252-8051 facsimile
katherine@hartsmithesq.com

Lee Ann Thompson, BPR # 28040
Buerger, Moseley & Carson, PLC
306 Public Square
Franklin, TN 37064
Telephone: (615) 794-8850
Facsimile: (615) 790-8861

Attorneys for Defendant Alive Hospice, Inc.

                                                                       s/Andy L. Allman